# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

---

CYNTHIA LUNDY,                              Civil No. 12-2443 (JRT/SER)

                     Plaintiff,

                                         **MEMORANDUM OPINION AND**

v.                                **ORDER GRANTING IN PART AND**
                                        **DENYING IN PART**

PARK NICOLLET CLINC,             **DEFENDANT'S MOTION FOR**
                                         **SUMMARY JUDGMENT**

                    Defendant.

---

Christopher J. Kuhlman, **KUHLMAN LAW, PLLC**, 333 Washington Avenue North, Suite 300, Minneapolis, MN 55401, for plaintiff.

Randi J. Winter and Sara Gullickson McGrane, **FELHABER LARSON**, 220 South Sixth Street, Suite 2200, for defendant.

This case arises out of Defendant Park Nicollet Clinic's ("Park Nicollet") termination of Plaintiff Cynthia Lundy. Lundy brings this action alleging that she was terminated for taking medical leave in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.* and that Park Nicollet interfered with her rights under the FMLA by discouraging her from seeking leave.[1] Park Nicollet moves for summary judgment on both of these claims. Because a material issue of fact remains as to whether Lundy was terminated because she took FMLA leave, the Court will deny

---

[1] Lundy also originally brought claims under the Minnesota Human Rights Act based on disability discrimination. In her response to the present motion, Lundy indicated that she wished to voluntarily dismiss those claims. (Pl.'s Mem. in Opp'n to Mot. for Summ. J at 30 n.5, Dec. 5, 2013, Docket No. 25; Letter to District Judge, Dec. 6, 2013, Docket No. 28.) Accordingly the Court will grant Park Nicollet's motion for summary judgment with respect to those claims.

Park Nicollet's motion with respect to Lundy's retaliatory termination claim. The Court will, however, grant Park Nicollet's motion with respect to Lundy's interference claim, as no reasonable jury could conclude that Park Nicollet discouraged her from seeking FMLA leave or denied her benefits under the statute.

## BACKGROUND

## I.  LUNDY'S ROLE AS A NURSE CLINICIAN

Lundy is a registered nurse and was hired in September 2009 as one of eight nurse clinicians in Park Nicollet's Mental Health Clinic ("the Clinic") located in St. Louis Park, Minnesota.  (Aff. of Christopher Kuhlman, Ex. 1 (Dep. of Cynthia Lundy ("Lundy Dep.") 9:13-10:5), Dec. 5, 2013, Docket No. 26; Kuhlman Aff., Ex. 3 (Dep. of Kathy Wagle ("Wagle Dep.") 16:17-18, 17:22-23).)[2]  Lundy's job duties included facilitating interactions between patients and physicians, filling and processing patient prescriptions, answering and returning patient phone calls, scheduling patient tests, carrying out providers' orders, and accurately charting events in patients' medical records.  (Wagle Dep. 28:9-11, 29:5-23, 30:1-31:16, 34:3-35:7; Lundy Dep. 12:10-24, 14:2-22; Aff. of Randi J. Winter, Ex. A at 31-33, Nov. 14, 2013, Docket No. 21.)  During her employment, Lundy was the primary nurse clinician for her two assigned providers: Psychiatrist Michael Ekern, MD and Clinician Nurse Specialist Yvonne Eissinger. (Lundy Dep. 12:25-13:13; Kuhlman Aff., Ex. 15 (Dep. of Yvonne Eissinger ("Eissinger

---

[2]  With the exception of depositions and documents filed under seal, page number references refer to the CMECF pagination.

Dep.") 5:19-20, 15:9-11); Winter Aff., Ex. B (Dep. of Michael Ekern ("Ekern Dep.") 6:14-21, 11:4-9).)

Lundy's team of eight nurses worked together to cover any absent nurse's workload, absorbing the absent nurse's providers' entire caseload, to ensure that all patients' needs were addressed on any particular day. (Lundy Dep. 11:14-12:9; Kuhlman Aff., Ex. 4 (Dep. of Melody Domanico ("Domanico Dep.") 9:8-10:10).)  Because the nurses covered each other's caseload, they had the opportunity to observe each other's work and patient charting. (Lundy Dep. 234:22-235:23; Domanico Dep. 35:14-16; Kuhlman Aff., Ex. 5 (Dep. of Deborah Ridgley ("Ridgley Dep.") 15:24-16:5); Kuhlman Aff., Ex. 2 (Dep. of Christina Gunderson ("Gunderson Dep.") 15:8-12).)

Kathy Wagle is the nurse manager at the Clinic and was the immediate supervisor for Lundy and the other Clinic nurses. (Lundy Dep. 19:20-22; Wagle Dep. 14:24-15:20.) Wagle's supervisor is the Clinic's director Dr. John McGreevy, who has overall responsibility for the Clinic. (Wagle Dep. 19:12-21; Lundy Dep. 19:23-25, 20:12-16.)  In consultation with McGreevy, Wagle was responsible for hiring and firing nurses and conducting performance reviews. (Wagle Dep. 19:10-21:20.)  Additionally, Wagle's job duties included staffing the Clinic with sufficient employees to manage the workload. (*Id.* 59:10-16.)

## II.    DISCIPLINARY ISSUES AND FMLA REQUESTS

### A.    First FMLA Leave

In September 2010 Lundy applied for intermittent FMLA leave as a result of severe breathing issues. (Lundy Dep. 34:13-15, 225:22-226:9.)  Her leave was approved by Park Nicollet's third-party administrator on October 11, 2010.  (Kuhlman Aff., Ex. 9.) According to Lundy, when Wagle learned that she had made an FMLA request Wagle asked her, "Is that really necessary?" (Lundy Dep. 38:14-24.)  Lundy explained to Wagle that she was experiencing severe breathing difficulties.  (*Id.* 38:20-24.)

Over the next year, Lundy took time off from work for various doctors' appointments, for which she provided Wagle with copies of doctor's notes.  (*Id.* 227:5-228:15.)   Lundy saw a pulmonologist, allergy specialist, general practitioner, and a second pulmonologist before she was diagnosed with chronic bronchitis.  (*Id.* 225:22-226:20.)  Lundy testified that Wagle became frustrated with all of the doctor's notes she was receiving from Lundy and told her "No more doctor's notes."  (*Id.* 228:19-21.)

### B.    Fall 2010 Issues

Prior to September 2010, there were no documented problems with Lundy's performance, and Wagle testified that she had no problems with Lundy's work "the first few months . . . because she was learning."  (Wagle Dep. 44:2-7.)  Lundy claims that after reporting her first FMLA leave to Wagle, Wagle began to paper Lundy's personnel file, scrutinize her attendance, and treat her differently from her other nurse colleagues. (Lundy Dep. 255:4-256:7.)  For example, on October 25, 2010, Lundy was returning

home from a vacation when her flight was delayed.  (*Id.* 97:24-98:17; Kuhlman Aff., Ex. 10.)  Lundy claims that she called into work and notified a coworker, Becky Pauly, and left a voicemail for Wagle that she would be unavailable for her shift the following day.  (Lundy Dep. 98:11-17; Kuhlman Aff., Ex. 10.)  Wagle contends that she never received the voicemail.  (Kuhlman Aff., Ex. 10.)  Wagle met with Lundy the day following the incident, and wrote a memorandum memorializing the meeting, which indicated that she told Lundy "I let her know I didn't want to have this become a pattern. (Feb 15, 2010 ill Monday, and July 19-25 vacation and ill on Monday.)"  (Kuhlman Aff., Ex. 10.)  Wagle noted, "I also asked her to leave me a voice message when these types of circumstances come up so we are able to plan for staffing."  (*Id.*)  Lundy testified that Wagle instructed her if she were ever late or absent from work again, she would have to call the department's front desk and also leave Wagle a voicemail.  (Lundy Dep. 60:1-3.) Lundy testified the other nurses who had also been late only had to call the front desk if they were going to be absent.  (*Id.* 60:1-4, 73:18-74:10.)  Lundy also claims that while the start time was 8:30 a.m. for all the nurses, she was the only nurse that Wagle required to be on time every day.  (*Id.* 73:15-74:2, 240:18-25, 242:14-20.)  Other nurses would consistently come in twenty to thirty minutes late.  (*Id.* 240:18-242:12.)

Another incident occurred in late October 2010 when a Park Nicollet employee informed Wagle that Lundy refused to see a patient "who showed up in the lobby and requested to be seen" because she was busy.  (Winter Aff., Ex. A at 36.)  The patient insisted on seeing a nurse, and another nurse who was on call at the time eventually saw the patient.  (*Id.*)  In a memorandum prepared on November 1, 2011, Wagle noted that

the Clinic nurses had been trained that if a patient shows up the nurse assigned to that patient's doctor is expected to meet with the patient.  (*Id.*)  Wagle reported that Lundy "realized after she did this that it was wrong and apologized to [the nurse who saw the patient].  She said she understood that she was wrong.  Let her know expectation regarding walk-ins and she indicated she understood."  (*Id.*)  Wagle also told Lundy "that a few support staff have found her to be difficult to approach in a situation like this.  She didn't agree that she was short or had an attitude with the support staff."  (Winter Aff., Ex. A at 36.)  When Lundy asked for specific examples, Wagle "suggested she focus on being more aware of how she comes across to others and this may not be her perception, but this is how others perceive this."  (*Id.*)  Lundy testified that she was unaware that it was her responsibility to see every patient that comes in, and had not realized at the time that the patient refused to leave without seeing a nurse.  (Lundy Dep. 93:12-22.)

### C.    Dr. Zimmerman's Concerns

Dr. Joshua Zimmerman brought an incident to Wagle's attention in February 2011 because he believed that Lundy had created a patient safety issue.  (Winter Aff., Ex. J (Dep. of Joshua Zimmerman ("Zimmerman Dep.") 27:4-18, Ex. 1.).)[3]  Zimmerman emailed Wagle on February 25, 2011, to inform her that while he was on vacation on February 16, Lundy incorrectly instructed a patient to contact an urgent care physician for information about side effects the patient was experiencing from a medication that was

---

[3] Zimmerman's deposition was filed under seal as Exhibit J to the Winter Affidavit. Exhibit 1 of Zimmerman's deposition was also filed under seal attached to the deposition excerpts, and will be referred to here as "Zimmerman Dep., Ex. 1."

prescribed by Zimmerman.   (Zimmerman Dep. 28:25-29:9, Ex. 1.)   According to Zimmerman, the standard work protocol would have been for Lundy to document the call and forward the note to a mental health physician for review.  (*Id.* 44:18-21, Ex. 1.) However, Lundy never forwarded the patient's concern to Zimmerman or any other mental health physician but instead used her own "misguided medical assessment." (*Id.* 46:21-24.)  In the email to Wagle, Zimmerman explained that he had already spoken to another doctor and Park Nicollet employee about the issue and offered to meet with Lundy alone, but they preferred that he let Wagle know about the incident.  (*Id.*, Ex. 1.)

Wagle responded to Zimmerman's email the next day by suggesting that she, Zimmerman, and Lundy meet to discuss the incident.   (*Id.*)   Eight weeks later, on March 24, 2011, Zimmerman emailed Wagle and another doctor, notifying them that he "[j]ust had [Lundy] crying in my office for 20 minutes about the issue below.  I thought [Wagle] and I were going to meet with her together?  She has some valid criticism that meeting 8 weeks after the incident doesn't give her a chance to remember what happened or defend herself." (*Id.*)

Wagle responded to Zimmerman that she had brought up the issue with Lundy when she discussed other concerns and there were timing issues in scheduling a meeting. (*Id.*)   Wagle also reported to Zimmerman "[t]he [sic] is more to this than you understand."  (*Id.*)  Lundy claims the fact Wagle waited eight weeks to address the incident suggests the mistake was not severe, and testified that Zimmerman continued to work with her without further issues.  (Lundy Dep. 117:20-118:13.)  In fact, Zimmerman

later gave Lundy an "ovation" for her excellent handling of a difficult task with one of his patients.[4]  (*Id.* 118:11-13; Kuhlman Aff., Ex. 18 at 6.)

### D.      Verbal Warnings Spring 2011

On March 24, 2011, Wagle met with Lundy to issue a verbal warning which was later typed up into a performance management feedback form that was provided to Lundy on April 11, 2011.  (Winter Aff., Ex. A at 40-41.)   Wagle checked boxes on the form indicating there were issues with Lundy's behavior and attendance.  (*Id.*, Ex. A at 40.) Wagle described the issue as:

> Cynthia is not meeting behavior expectations regarding attitude and communication.  There were two separate meetings where staff had concerns about Cynthia's behavior.  Staff felt that Cynthia overreacted about an issue, was disrespectful and demeaning.  Staff feels that this behavior is intimidating.
>
> It has also been reported by another department that Cynthia's behavior was rude, uncooperative and negative when she was dissatisfied about her space and the modifications that were made.
>
> On 3/23/2011 Cynthia arrived at work at 10:00 and did not call in to let anyone know she would be late.  Due to not calling, staff did not know if she was going to be at work.

(*Id.*)  The form outlined performance, behavioral and policy expectations for Lundy of communicating "respectively and professionally with all employees," talking with Wagle directly "regarding any concerns," and calling the front desk as well as Wagle if she was going to be late.  (*Id.*)  Wagle indicated that she would "continue to monitor [Lundy's]

---

[4] An ovation is an internal recognition form at Park Nicollet that coworkers can fill out, commending a colleague for good service provided.  (Kuhlman Aff., Ex. 7 at 52:22-53:4.)

behavior on an on-going basis and provide feedback as needed.  Failure to meet the expectations will result in further discipline, including termination of employment." (*Id.*, Ex. A at 41.)  After the March 24 meeting, Lundy emailed Wagle explaining that she would "explore the items that have been discussed as you request" and informed Wagle that she was "receptive to your feedback and concerns.  I do like and appreciate my position here at Park Nicollet and I am wanting to stay here." (*Id.*, Ex. A at 42.)

When Lundy met with Wagle on April 11 for a follow up discussion regarding the verbal warning, she declined to sign the form.  (Winter Aff., Ex. A at 41; Lundy Dep. 112:22-113:1.)  Lundy asked Wagle "for specifics" so she "could go and clarify with staff any issues," and testified that Wagle "was never able to give me any specifics about anything."  (Lundy Dep. 113:25-114:6.)  Lundy refused to sign the form because she "disagree[d] with the issues" presented by Wagle, was given no specifics, and believed she "was always communicating respectfully and professionally."  (*Id.* 112:23-113:1, 114:3-6, 115:21-24.)

### E.    Positive Feedback

In the interim between Lundy's verbal warning and a final written warning described below, several of her Park Nicollet coworkers documented positive feedback of Lundy's performance and behavior.  (*See* Kuhlman Aff., Ex. 18.)

On March 25, 2011, one of Lundy's colleagues, Emily Weinberg handwrote a letter to Lundy that she greatly admired Lundy's "passion, dedication, and patience as a nurse."  (Kuhlman Aff., Ex. 18 at 4.)  Weinberg wrote that she found Lundy "helpful and

easy to approach" and that Lundy was an "amazing nurse and caregiver."   (*Id.*) Weinberg wrote that Lundy came to the department at a difficult time and faced a lot of pressure and responsibility, but never took out her frustration on the support staff.  (*Id.*)

On March 30, 2011, Doctor Richard Lentz wrote a letter to Lundy indicating that he highly recommended Lundy for a position as an on-call mental health nurse on weekends.  (*Id.*, Ex. 18 at 2.)  In the letter, Lentz noted that he had worked with Lundy many times over the past eighteen months and noted that Lundy "handle[d] phone calls, including urgent situations, ma[d]e assessment, and use[d] judgment" and he believed her to be "competent and effective" in all of these tasks.  (*Id.*)

On April 4, 2011, mental health assistant Molly Goodfellow wrote a letter indicating that she had worked with Lundy for about a year and a half and that Lundy was approachable and easy to work with.  (*Id.*, Ex. 18 at 5.)  Goodfellow wrote that she was happy to have Lundy as a coworker and that Lundy was a "very caring individual who treats both her patients and colleagues with respect and compassion."  (*Id.*)

On May 12, 2011, one of Lundy's coworkers and a Park Nicollet patient, Julie Simondet, wrote an email to Wagle and McGreevy indicating that Lundy was kind and compassionate with her patients and an "amazing nurse."  (*Id.*, Ex. 18 at 3.)  She wrote that Lundy's "calmness and professional manner is very much appreciated."  (*Id.*) Simondet also sent Lundy an ovation for being "an excellent nurse."  (*Id.*, Ex. 18 at 7.)

## F.      Dr. Ekern's Concerns

On June 20, 2011, Ekern documented concerns that he had with Lundy's work performance.  (Ekern Dep. 22:4-14; Winter Aff., Ex. B at 61.)  Ekern explained:

> My concerns with [Lundy] seem related to her having a lack of understanding of/experience with, mental health issues.  Phone notes sent to me after have significantly inadequate info, or info that doesn't address the real topic of the patient[']s question.
>
> A handful of patients have voiced to me, after phone encounter[s] with [Lundy], that it didn't seem like she understood or processed their concern correctly.
>
> There have been some general mistakes in the phone notes.  Occasionally I will receive a phone note on a patient that is attached to the wrong patient.

(Winter Aff., Ex. B at 61; Ekern Dep. 13:7-21.)  Ekern testified that he had discussed these concerns informally with Wagle, McGreevy, and other Park Nicollet clinicians. (*Id.* 14:15-15:10.)

## G.      Written Warning

Although Wagle testified that Lundy's attendance issues were resolved after March 23, 2011 (Wagle Dep. 48:1-6), on June 20, 2011, Wagle sent an email to McGreevy, John Chilson, a senior employee labor relations specialist in Park Nicollet's human resources department, and various other individuals, which included a log of Lundy's absences (Kuhlman Aff., Ex. 11; *id.*, Ex. 17 (Dep. of John Chilson ("Chilson Dep.") 9:7-9)).   The email noted that Lundy "has a 8.5% rate of unplanned absences." (Kuhlman Aff., Ex. 11 at 1.)  The log attached to the email faulted Lundy for being absent on June 14, 15, and 16, but those were dates that Lundy had intermittent FMLA

leave.  (*Id.*, Ex. 11 at 2; *id.*, Ex. 12.)  In the email, Wagle explained that in addition to attendance issues "there is concern regarding her decision making and judgment," and specifically referenced the complaints from Ekern.  (*Id.*, Ex. 11 at 1.)  Wagle noted that "[d]ocumentation issues were discussed with her during the verbal warning."  (*Id.*) Wagle concluded that she, McGreevy, and Amelia Merz, the Clinic chairwoman "all feel she is not a team player and not a good fit."  (*Id.*; Ekern Dep. 22:13.)

On June 30, 2011, Wagle issued Lundy a written warning and checked boxes indicating concerns with Lundy's performance, behavior, and attendance.  (Winter Aff., Ex. A at 44-46.)  Wagle indicated that Lundy was not "meeting the behavior expectations regarding her attendance, arriving to work on time, and communication."  (*Id.*, Ex. A at 44.)  With respect to attendance, Wagle noted that Lundy

> has been absent 5.6% of her hours which exceeds the department threshold of 3%.  In addition she has been tardy approximately 30 minutes on the following dates June 22, 27, 29, and June 30, 2011.  She only called to in form [sic] staff one out of the four times.  She was 2.5 hours late on June 17, 2011 when she was contacted by a staff member.  She said she overslept.

(*Id.*, Ex. A at 44.)  Wagle's warning stated that Lundy was tardy on five occasions in June 2011, but that she only called to inform staff once.  (*Id.*)

With respect to behavior, the written warning recounted Ekern's complaints and noted that "[t]he patient[]s perceive that she doesn't understand what they are asking for and she comes across short and rude."  (*Id.*)[5]  Wagle also noted that after being out on

---

[5] As support for the contention that patients complained about Lundy, Park Nicollet cites to what it claims is a complaint from a patient regarding Lundy.  (*See* Def.'s Mem. in Supp. of

(Footnote continued on next page.)

FMLA leave, Lundy "showed no initiative" to reschedule a training she had missed during her absence and that Wagle "rescheduled her." (*Id.*, Ex. A at 44-45.) Wagle indicated that she "experi[e]nced [Lundy's] behavior as rude and short" and "disrespectful" when there was an issue with Lundy's computer and when a vacation day request was denied. (*Id.*, Ex. A at 45.) The written warning indicated that Lundy must ensure that "unplanned absentism [sic] is kept below 3%," notify the front desk and Wagle if she was going to be late, "communicate professionally and respectfully to all employee's [sic] and patients at [Park Nicollet]," and document patient interactions "appropriately and demonstrate interpersonl [sic] respect and clinical competency of an Registered nurse." (*Id.*, Ex. A at 45.) Lundy declined to sign the written warning because she disagreed with the accuracy of the document's allegations. (Lundy Dep. 125:1-10; Winter Aff., Ex. A at 46.)

### H.    Second and Third FMLA Leave

In July 2011, Lundy developed cellulitis in her left breast. (Lundy Dep. 229:17-25.) After consulting with doctors and undergoing various tests, Lundy was scheduled for surgery on October 6, 2011. (*Id.* 229:23-232:9; Kuhlman Aff., Ex. 25 at 000523-24.)

_____
(Footnote continued.)

Mot. for Summ. J. at 9, Nov. 14, 2013, Docket No. 20.) That document appears to be a small piece of paper with a few lines of handwritten text on it, but the text is completely illegible because the entire slip is too dark. Because the complaint produced by Park Nicollet is completely illegible (*see* Winter Aff., Ex. A at 43), the Court has not relied upon it in deciding the present motion.

Several days before her scheduled surgery, Lundy submitted an FMLA request, which was granted. (Lundy Dep. 35:4-8; 49:13-17.)[6] When she presented the FMLA paperwork to Wagle, Lundy testified that Wagle became noticeably frustrated, grabbed the FMLA paperwork from Lundy's hands, said "I can't believe this," rolled her eyes, and then said "I do not have enough employees." (*Id.* 34:22-35:23.)

## III. TERMINATION

On October 3, 2011, Chilson met with McGreevy and Wagle to discuss ongoing performance concerns with Lundy. (Winter Aff., Ex. E at 24.) They agreed to meet with Lundy when she returned from her leave. (*Id.*) In notes of this meeting, Chilson stated that it was "possible that [Lundy] could be terminated as a result of the performance issues, more information is being gathered by Wagle." (*Id.*)

In a memorandum dated October 4, 2011, Wagle wrote to McGreevy regarding her concerns about Lundy's performance related to: "errors, her lack of attention to detail, not following standard work and lack of follow through." (Winter Aff., Ex. D at 15.) Wagle testified that many of the issues addressed in the October 4 memorandum about Lundy's performance that eventually led to the decision to terminate Lundy "surfac[ed]" during Lundy's FMLA leave because during this period of time other nurses were covering Lundy's case load and discovering the alleged errors. (Wagle Dep. 73:13-74:2, 77:17-78:5.) Wagle testified that other nurses "unsolicited were bringing things to

---

[6] In September 2011 Lundy made a second request for intermittent FMLA leave due to her breathing issues, which was granted. (Lundy Dep. 34:5-17.)

me" related to Lundy's errors and she did not "believe they all knew that they were bringing things." (*Id.* 73:21-23.) Wagle testified, however, that the only nurse she could remember bringing her attention to an error of Lundy's was Gunderson. (*Id.* 74:3-12.)

The October 4 memorandum discussed a concern raised by Ekern on September 15 "regarding a telephone encounter related to a lost or stolen prescription" in which Ekern did not believe that Lundy was "triaging calls appropriately" or "understanding the detail that was needed." (*Id.*) When Ekern approached Lundy with his concerns, he believed she "didn't follow direction." (*Id.*; Ekern Dep. 43:4-10.) The memorandum also indicated that Lundy failed to use standard markings on phone messages to allow other nurses to understand the status of the message – whether it had been addressed or not, failed to adequately document her calls, on one occasion failed to route a message regarding patient medication to the provider, and on one occasion faxed a patient chart that was missing information. (Winter Aff., Ex. D at 16.) Wagle's overall assessment of these incidents was that they demonstrated Lundy's "lack of attention to detail" and failure to "follow[] standard work." (*Id.*) Wagle's memorandum addressed concerns with Lundy's performance that had allegedly been discovered during Lundy's absence including incorrect citalopram documentation and "fuschia forms" mistakes, which are detailed below. (*Id.*)

## A.   Citalopram Charting

Park Nicollet created an internal "dot phrase," which, if typed into a patient record, would populate a list of questions a nurse should ask a patient with a prescription

for citalopram and relay to the patient's provider regarding, among other things, the drug's side effects.  (Kuhlman Aff., Ex. 7 (Dep. of Sandra Harter ("Harter Dep.") 32:9-17, 33:19-34:15).)   Wagle's October 4 memorandum indicated that one of Lundy's performance issues was her failure to use this dot phrase.  (Winter Aff., Ex. D at 15.)  But another nurse at the Clinic testified that the dot phase was not mandatory, and nurses were allowed to use their own notations regarding citalopram, provided the appropriate questions were still asked.  (Kuhlman Aff., Ex. 5 (Dep. of Deborah Ridgley ("Ridgely Dep.") 23:4-13).)   Another citalopram related error identified in Wagle's October 4 memorandum was an incident in which a patient called regarding citalopram and Lundy allegedly failed to ask her the questions prompted by the dot phase.  (Winter Aff., Ex. D at 15.)  The patient's chart shows that Lundy did not ask the citalopram questions because she could not reach the patient via telephone.  (Kuhlman Aff., Ex. 19.)

### B.    Fuchsia Forms

In her October 4 memorandum, Wagle also identified an issue with Lundy's failure to use fuchsia forms.  (Winter Aff., Ex. D at 16; Wagle Dep. 77:21-24.)  Fuchsia forms were designed to track whether patients had their appropriate labs and tests done.  (*See* Lundy Dep. 246:10-17.)   Another nurse at the Clinic testified that fuchsia forms had been abandoned by Park Nicollet at the time Lundy allegedly failed to complete them.  (Gunderson Dep. 34:5-8.)  Eissinger also testified that she often routinely failed to follow through with processing fuchsia forms for her patients.  (Eissinger Dep. 36:1-14.)

C.      **Termination Meeting**

On October 19, 2011, while Lundy was still out on FMLA leave, Wagle and Chilson spoke on the phone.  (Winter Aff., Ex. E at 24.)   Chilson's notes of the conversation indicated that Wagle "has been discovering additional performance concerns related to Cindy Lundy, she will document the concerns and send them to me." (*Id.*)  On November 3 Wagle and Chilson met, and Chilson noted that "[f]rom [Wagle's] information it[']s clear that performance issues are still prevalent in Cindy's work."  (*Id.*) Chilson also noted that if Lundy returned to work that Monday "we intend to address the performance issues with her, hear her side and if appropriate terminate her employment due to the seriousness of her on-going performance issues."  (*Id.*)

On November 7, 2011, Lundy's first day back from her FMLA leave, she was called into a meeting with Wagle and Chilson and told that this was her "last day at Park Nicollet."  (Lundy Dep. 78:1-24.)  Lundy was given the option and resigned in lieu of termination in order to receive an additional two-weeks' pay.  (*Id.* 77:14-25.)  Lundy testified that during the short meeting she was not told why she was being terminated. (*Id.* 78:17-19, 79:9-12.)  She testified that she was told to go to her office, gather her things, and not talk to anybody on the way out.  (*Id.* 78:22-24, 79:23-25.)

Wagle testified that Lundy was terminated:

Because of the concerns regarding her lack of attention to detail, the unsolicited things that got brought to my attention, regarding the things that were left incomplete, regarding her work before she left, and I felt that for our patients that was in their best interest that she not be there.

. . . .

- 17 -

It was the lack of documentation related to the citalopram, not following through with standard work. It was related to not following through and learning from her coaching about the dispositions and the rework, and the things being left undone.

(Wagle Dep. 119:21-120:13.)

## IV.    OTHER NURSES

In opposition to the present motion, Lundy also presents evidence that other nurses at the Clinic made mistakes in charting, but were not subject to discipline. In July 2011, Park Nicollet transitioned to using a different program for electronic medical records known as EPIC. (Harter Dep. 56:6-8.) Harter testified the there was "a learning curve to learn EPIC and how to maneuver through EPIC." (*Id.* 58:8-9.) Other nurses testified that it was a "huge transition" and they made errors or mistakes as they were getting used to the EPIC system. (Domanico Dep. 24:21-25:8; Ridgley Dep. 14:15-25 (testifying that she had difficulties with EPIC and agreeing that her co-workers "were having difficulties or making mistakes when EPIC went live").)

Lundy also presents testimony from other nurses who observed no problems with her work. Harter testified that she had reviewed Lundy's patient charts during her employment and that she had never personally seen any errors or mistakes in her charting. (Harter Dep. 27:16-23.) Ridgley similarly testified that she routinely covered for other nurses and could not recall ever seeing any problems with Lundy's work nor had she ever brought any concerns about Lundy's work to anyone at Park Nicollet. (Ridgley Dep. 15:24-16:14.) Domanico also had the opportunity to review patient files that Lundy had worked on and could not recall coming across any problems with Lundy's

charting.  (Domanico Dep. 35:10-25.)  Gunderson, the only nurse who Wagle recalled as bringing concerns with Lundy's work to Wagle, testified she could not recall problems with Lundy's work or charting during her entire time working with Lundy, nor could she recall whether she raised any issues about Lundy's charting.  (Gunderson Dep. 15:8-25.)

Other nurses also testified that they had made typographical mistakes in their charts before – such as putting the wrong phone or fax number on prescriptions. (Gunderson Dep. 25:5-19; Domanico Dep. 21:16-20.)  Ridgley testified that she makes mistakes entering information into a prescription approximately once a week, and that typically these mistakes come to her attention through patient calls or from Park Nicollet's workroom.  (Ridgley Dep. 19:3-25.)

## V.    COMPLAINT

Lundy filed a complaint against Park Nicollet alleging, of relevance to the present motion, interference with her FMLA rights and retaliation in violation of the FMLA. (Compl., Sept. 24, 2012, Docket No. 1.)  With respect to interference, Lundy alleges that "[d]efendant failed to provide Ms. Lundy with appropriate notice of her FMLA rights and responsibilities after she requested leave covered by the FMLA" and "denied Ms. Lundy leave she was entitled to take under the FMLA."  (*Id.* ¶¶ 46-47.)  With respect to retaliation, Lundy alleges that "[d]efendant terminated Ms. Lundy's employment after she exercised leave covered under the FMLA" and "used Ms. Lundy's exercise of leave covered under the FMLA as a negative factor in its decision to terminate her employment."  (*Id.* ¶¶ 53-54.)

## ANALYSIS

### I.    STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of [each] element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (internal quotation marks omitted).

### II.    FMLA CLAIMS

The FMLA provides eligible employees up to twelve work-weeks of unpaid leave in any twelve-month period and prohibits employers from discriminating against employees for exercising their rights under the Act.  29 U.S.C. §§ 2612, 2615(a)(2); *see*

*also Darby v. Bratch*, 287 F.3d 673, 679 (8th Cir. 2002).  The Eighth Circuit has recently clarified that three main types of claims are cognizable under the FMLA: entitlement, retaliation, and discrimination.  Entitlement claims "occur[] where an employer refuses to authorize leave under the FMLA or takes other action to avoid responsibilities under the Act."  *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005 (8th Cir. 2012).[7] This category of claims includes circumstances where "[a]n employer's action . . . deters an employee from participating in protected activities."  *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006).  Retaliation claims protect an employee who "opposes any practice made unlawful under the FMLA – for example . . . complain[ing] about an employer's refusal to comply with the statutory mandate to permit FMLA leave" by providing a cause of action against an employer who "for that reason take[s] adverse action against the employee who is engaged in the opposition."  *Pulczinski*, 691 F.3d at 1005-06.  Finally, discrimination claims arise

> when an employer takes adverse action against an employee because the employee exercises rights to which he is entitled under the FMLA.  In this scenario, the employer does not prevent the employee from receiving FMLA benefits.  Rather, it is alleged that after the employee exercised his statutory rights, the employer discriminated against him in the terms and conditions of employment.  An employee making this type of claim must prove that the employer was motivated by the employee's exercise of rights under the FMLA.

---

[7] "Entitlement" claims are often referred to in earlier case law as "interference" claims. *See, e.g., Wisbey v. City of Lincoln, Neb.*, 612 F.3d 667, 675 (8th Cir. 2010), *abrogated on other grounds by Torgerson*, 643 F.3d 1031.

*Id.* at 1006.[8]

In light of *Pulczinski*, the two claims advanced by Lundy, although titled "interference" and "retaliation" claims in her complaint are best understood as entitlement and discrimination claims. Specifically, Lundy claims that Wagle's comments interfered with or deterred her from seeking FMLA benefits – an entitlement claim – and that she was terminated because she took FMLA leave – a discrimination claim under the framework of *Pulczinski*.

### A.     FMLA Entitlement

Under the FMLA, "an employer is prohibited from interfering with, restraining, or denying an employee's exercise of or attempted exercise[] of any FMLA right." *Wisbey v. City of Lincoln, Neb.*, 612 F.3d 667, 675 (8th Cir. 2010) (citing 29 U.S.C. § 2615(a)(1)), *abrogated on other grounds by Torgerson*, 643 F.3d 1031. Interfering with an employee's entitlement to FMLA rights includes, for example, "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b); *see also Quinn v. St. Louis Cnty.*, 653 F.3d 745, 753 (8th Cir. 2011). But in order to maintain an entitlement claim a plaintiff must also show "that the employer denied the employee entitlements under the FMLA." *Quinn*, 653 F.3d at 753.

Lundy argues that Park Nicollet interfered with her right to use FMLA leave because Wagle's comments stating "is that really necessary," "no more doctor's notes,"

---

[8] Confusing matters, these "discrimination" claims are sometimes referred to in previous case law as "retaliation" claims. *See, e.g.*, *Stallings*, 447 F.2d at 1051-52.

and "I can't believe this.  I don't have enough employees" when being presented with Lundy's FMLA paperwork "would have discouraged a reasonable employee from seeking leave and thus constitutes a restraint of Lundy's exercise of rights."  (Pl.'s Mem. in Opp'n to Mot. for Summ. J. at 43, Dec. 5, 2013, Docket No. 25.)  But a plaintiff's claim for entitlement cannot be based upon the possibility that an employer's behavior would have discouraged a reasonable employee from seeking FMLA leave without evidence that the employee herself was deterred.  *See Whitney v. Franklin Gen. Hosp.*, Civ. No. 13-3048, 2014 WL 360106, at *13 (N.D. Iowa Feb. 3, 2014) ("[A]n 'interference/entitlement' claim cannot be based on conduct that would discourage an employee of ordinary firmness from taking FMLA leave, even if the plaintiff was not herself deterred, but must be based on allegations (and eventual proof) 'that the employer denied her entitlements under the FMLA.'" (alteration omitted) (quoting *Pulczinski*, 691 F.3d at 1007)).  Here, Lundy has presented no evidence that Park Nicollet prevented her from taking FMLA leave or that Wagle's comments did, in fact, deter **her** from seeking benefits.  For example, Lundy has presented no evidence that there were periods of time when Park Nicollet denied her benefits or when she would or could have, but did not, seek FMLA leave as a result of Wagle's comments.  *See Brown v. City of Jacksonville*, 711 F.3d 883, 891 (8th Cir. 2013) ("Brown does not argue the City prevented her from taking FMLA leave.  Thus, she has no 'entitlement' claim."); *Quinn*, 653 F.3d at 753 (granting summary judgment on an entitlement claim where "Quinn does not contest the district court's finding that she received the full twelve weeks of FMLA leave to which she was entitled each year she requested it").  Accordingly, the Court concludes that no

reasonable jury could find that Park Nicollet denied Lundy entitlements under the FMLA and will grant Park Nicollet's motion for summary judgment with respect to this claim.

### B.    FMLA Discrimination

Absent direct evidence, an FMLA discrimination claim is evaluated under the burden-shifting framework of *McDonnell Douglas*.  *Chappell v. Bilco Co.*, 675 F.3d 1110, 1116-17 (8th Cir. 2012).  An employee must first establish a prima facie case by showing that she (1) engaged in activity protected under the Act, (2) suffered an adverse employment action by the employer, and (3) a causal connection existed between the employee's action and the adverse employment action.  *Wisbey*, 612 F.3d at 676.  The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its challenged actions.  *Stallings*, 447 F.3d at 1051.  "Once the employer comes forward with evidence of a reason other than retaliation for the employee's discharge, the employee is left with the opportunity to demonstrate that the proffered reason is not the true reason for the employment decision."  *Id.* at 1052 (internal quotation marks omitted); *see also Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002).

### 1.    Prima Facie Case

In its brief in support of the motion for summary judgment, Park Nicollet appears to ask the Court to assume, for purposes of this motion, that Lundy has established a prima facie case.  Specifically, Park Nicollet states "[a]lthough Park Nicollet does not agree Lundy can make out a prima facie case to support her claim, for purposes of this motion, it focuses its analysis to Lundy's lack of evidence of pretext."  (Def.'s Mem. in

Supp. of Mot. for Summ. J. at 19, Nov. 14, 2013, Docket No. 20 (footnote omitted).) Despite this apparent concession, Park Nicollet does raise a substantive challenge to Lundy's prima facie case in a footnote, arguing that "any alleged causal connection between Lundy's taking of a FMLA leave in October 2011 and her termination on November 7, 2011, is severed by Park Nicollet's discovery of new performance issues during Lundy's leave of absence." (*Id.* at 19 n.8.)  Although it is unclear whether Park Nicollet intends to challenge Lundy's ability to demonstrate a causal connection between her taking of FMLA and her termination for purposes of this motion, in the interest of thoroughness, the Court will address the issue.

To establish a causal link between the employee's exercise of FMLA rights and her termination, the employee must prove "that an employer's retaliatory motive played a part in the adverse employment action." *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002) (internal quotation marks omitted).  "Evidence giving rise to an inference of retaliatory motive on the part of the employer is sufficient to establish the requisite causal link."  *Thomas v. Corwin*, 483 F.3d 516, 531 (8th Cir. 2007). Additionally "[a]n employee can establish a causal link between her protected activity and the adverse employment action through the timing of the two events," although "[t]emporal evidence should generally be corroborated by other evidence of employment discrimination."  *Marez v. Saint-Gobain Containers, Inc.*, 688 F.3d 958, 963 (8th Cir. 2012) (internal quotation marks omitted).

The Court concludes that Lundy has presented sufficient evidence giving rise to an inference of retaliatory motive as well as evidence of temporal proximity between her

protected conduct and the adverse employment actions she suffered to satisfy her burden of establishing the causation element of a prima facie case. As an initial matter, the Court notes that in examining the causal element of the prima facie case, it considers the relationship between Lundy's protected conduct and all of the adverse employment actions taken by Park Nicollet that precipitated Lundy's termination. Although Lundy's termination is undoubtedly an adverse employment action, *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997), other actions "that disadvantage or interfere with an employee's ability to do his or her job, as well as 'papering' an employee's file with negative reports or reprimands, are sufficiently adverse to meet the Title VII standard for retaliation claims," *Tademe v. Saint Cloud State Univ.*, 328 F.3d 982, 992 (8th Cir. 2003). *See also Lee v. N.M. State Univ. Bd. of Regents*, 102 F. Supp. 2d 1265, 1274 (D.N.M. 2000) ("Compiling negative reports of a plaintiff's work performance or similar heightened scrutiny can also be an adverse employment action, if such reports and scrutiny adversely affects the employee's job position."). Here, Lundy has presented evidence that she was subjected to increased scrutiny, negative performance reviews, and a targeted investigation to discover errors on her part that ultimately formed the basis for her termination. If the negative performance reviews, increased scrutiny, and investigation that led to her termination were retaliatory in nature, their relationship to her protected conduct is also relevant to the Court's causation analysis. *See Marez*, 658 F.3d at 964 (finding evidence of causation supporting a retaliation claim where, in addition to a close temporal proximity between plaintiff's notification to her employer that she would require FMLA leave and her termination, plaintiff also "claimed that [her

employer] was looking for errors because [plaintiff] had told her that she would need FMLA leave"); *Bader v. Special Metals Corp.*, Civ. No. 11-0882, 2013 WL 6264660, at *21 (N.D.N.Y. Dec. 4, 2013) (explaining that for purposes of causation even long gaps between protected conduct and an adverse employment action "may be bridged by an intervening pattern of retaliatory treatment").

In other words, in addition to temporal proximity "[a]dditional evidence of retaliatory conduct that may suffice [to prove the causation element of a prima facie case] includes but is not limited to evidence that the plaintiff faced higher disciplinary scrutiny than similarly situated employees, or that the plaintiff faced higher scrutiny than she faced before engaging in the protected activity." *Fledderman v. Daiichi Sankyo, Inc.*, 930 F. Supp. 2d 899, 914 (S.D. Ohio 2013). In *Fledderman*, for example, the court found sufficient evidence of a causal connection to support a prima face case of retaliation where there was evidence which "if believed, would support an inference that the actions of [the employer] taken subsequent to Plaintiff's report of harassment were retaliatory and designed to build a case against Plaintiff to support her eventual termination." *Id.* at 915. The evidence included, among other facts, that the employer initiated disciplinary actions close in time to the Plaintiff's report of harassment and the Plaintiff had not been subjected to disciplinary action prior to her protected conduct. *Id.* at 915-16. Additionally, the evidence showed that the employer chose to engage in an investigation "for the purpose of showing consistent negative performance by Plaintiff, which suggests that insufficient evidence existed prior to Plaintiff's report of harassment." *Id.* at 915.

Here, Lundy has presented evidence demonstrating that from September 2009, when she began her employment at Park Nicollet, until September 2010 when she submitted her first request for intermittent FMLA leave, there were no documented problems with her performance, and Wagle testified that she had no problems with Lundy's work during this first year.  On October 11, 2010, Lundy's first request for FMLA leave was approved, and Wagle asked her if that leave was "really necessary." (Lundy Dep. 38:14-24.)  Two weeks later, Wagle began to document problems with Lundy's attendance when she drafted a memorandum memorializing a meeting with Lundy regarding the fact that Lundy was delayed in returning to work following a vacation on October 26, 2010.  The temporal proximity between Lundy's protected conduct and Wagle's increased scrutiny is sufficient to demonstrate a causal connection. *See Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 1000-01 (8th Cir. 2011) (finding one week between protected activity and termination was sufficient to establish prima facie element of causation); *Smith*, 302 F.3d at 833 (finding two weeks between protected activity and adverse employment action "sufficient" to establish causation).  Viewing the facts in the light most favorable to Lundy, a jury could conclude that following this initial request for FMLA leave Wagle subjected Lundy's attendance to increased scrutiny – requiring Lundy to follow a more onerous procedure than other nurses if she was going to be late to or absent from work and requiring Lundy, but not the other nurses in the Clinic, to report to work on time to avoid discipline.

Although concerns about Lundy had been brought to Wagle's attention by Dr. Zimmerman in February 2011, it was not until the end of March 2011 – when Wagle

had collected more evidence regarding Lundy's alleged attendance issues – that she issued a verbal warning related to Lundy's attendance and her attitude towards other staff.  On June 20, 2011 Wagle sent an email that would ultimately result in the written warning issued to Lundy on June 30, 2011.  In the email Wagle explained that Lundy had a high rate of unplanned absences, and included in her log of those absences dates that Lundy had taken intermittent FMLA leave.  In the written warning Wagle also discussed other issues, including that when Lundy missed a training while out on FMLA leave that she "showed no initiative" to reschedule the training.  (Winter Aff., Ex. A at 44-45.)  The close similarity between Lundy's protected conduct (taking FMLA leave) and some of Wagle's stated reasons for discipline (that Lundy was absent and did not take initiative to reschedule missed trainings) could allow a reasonable jury to conclude that there is a causal connection between the two events.  *See Schaefer v. BioLife Plasma L.L.C.*, Civ. No. 11-3468, 2013 WL 5275818, at *6 (D. Minn. Sept. 18, 2013) ("The allegedly false conduct underlying Schaefer's incident report . . . was the same alleged conduct underlying the request for workers' compensation.  The close link between the report of the injury, the request for compensation, and Schaefer's termination satisfies the causal connection.").

Additionally, after Lundy made her final request for FMLA leave Wagle became noticeably frustrated, grabbed the paperwork from Lundy, said "I can't believe this," rolled her eyes, and then said "I do not have enough employees."  (Lundy Dep. 34:33-35:23.)  Almost immediately after Lundy began that FMLA leave in early October 2011, on October 3 Wagle met with Chilson and McGreevy, and Wagle agreed to gather more

information about Lundy's performance issues.  In a memorandum dated one day later, Wagle laid out numerous concerns with Lundy's performance that were allegedly discovered while Lundy was out on leave.[9]  This memorandum and the investigation to unearth problems with Lundy's performance ultimately led to Lundy's termination, which occurred on Lundy's first day back from FMLA leave on November 7, 2011.

A reasonable jury could conclude that the circumstances surrounding Lundy's termination give rise to an inference of retaliatory motive on the part of Park Nicollet. Specifically, a jury could conclude that the close temporal proximity between Lundy's initial request for FMLA leave and the first disciplinary action taken against her, as well as the increased scrutiny of her attendance (an issue closely related to Lundy's use of intermittent FMLA leave) and performance by Wagle support an inference that Lundy's

---

[9] Park Nicollet contends that any causal connection between Lundy's taking FMLA leave and her termination the day she returned to work was severed by Park Nicollet's discovery of new performance issues during Lundy's leave of absence.  *See Lenzen v. Workers Compensation Reinsurance Ass'n*, 705 F.3d 816, 822 (8th Cir. 2013) ("Lenzen's intervening unprotected conduct – poor work performance and insubordination in November and December 2008 – precludes any inference of a causal connection between the September 11 letter and her termination.").  As explained above, the causal connection between Lundy's final FMLA leave and her termination is not the only relevant connection in assessing whether retaliation motivated Lundy's discharge.  Furthermore, the fact that Wagle specifically undertook an investigation of Lundy – an action she did not take with respect to any other nurses in the Clinic – after telling Lundy she could not believe that Lundy was requesting more FMLA leave could itself support an inference of retaliatory motive.  At most, whether Wagle actually discovered new performance issues while Lundy was absent raises a genuine issue of material fact and summary judgment is therefore inappropriate.  The memorandum relied upon for Lundy's termination written by Wagle was dated October 4, 2011 – the day that Lundy began her FMLA leave. Therefore a reasonable jury could conclude that the complaints contained in it – such as the problems with the fuschia slips and the citalopram charting – that Wagle contends were brought to her attention during Lundy's leave when other nurses took over her stations, may have been known to Wagle at the time of Lundy's leave, and therefore would not be an "intervening" discovery sufficient to sever a causal connection between Lundy's leave and her termination.

request for FMLA leave motivated the disciplinary action and scrutiny.  Additionally, a reasonable jury could conclude that these initial disciplinary actions precipitated even more scrutiny of her performance, and when she took her final FMLA leave, Wagle almost immediately set out to investigate her performance and gather sufficient evidence to support Lundy's termination.  Based on these facts, the Court concludes that Lundy has satisfied her prima facie burden of demonstrating a causal connection between her protected activity and her termination.  *See Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588-89 (6th Cir. 2009) ("Given the close temporal proximity between Upshaw's August 2003 EEOC charge and [the company]'s request for information from other employees documenting Upshaw's complaint activity, and [Upshaw's supervisor]'s request for discipline, a reasonable juror could find that Upshaw has established a prima facie case of retaliation."); *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435-36 (6th Cir. 2009) ("The combination of this increased scrutiny with the temporal proximity of his termination occurring less than three months after his EEOC filing is sufficient to establish the causal nexus needed to establish a prima facie case."); *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 176-77 (2d Cir. 2005) (explaining that instances of adverse employment action occurring outside the statute of limitations period "show[ed] a chain of events that arose immediately after [the protected conduct]" and might support "a causal link between the protected activity and the actionable adverse acts").

## 2.  Legitimate, Nondiscriminatory Reason

At this stage of the *McDonnell-Douglas* test, the employer must merely "articulate[] lawful reasons for the action; that is, . . . produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus."  *Tex. Dep't of Cmty. Affairs Burdine*, 450 U.S. 248, 256-57 (1981) (holding that "the employer's burden is satisfied if he simply explains what he has done or produces evidence of legitimate nondiscriminatory reasons" (alteration and internal quotation marks omitted)).  The employer's burden is not one of proof or persuasion, and can be met with "[a] minimal evidentiary showing."  *Davis v. KARK-TV, Inc.*, 421 F.3d 699, 704 (8th Cir. 2005).  In its brief, Park Nicollet contends that it "terminated Lundy because of her on-going performance issues and because of its genuine concern for patient care and safety.  Even after Park Nicollet issued the Final Written Warning, Lundy's inadequate charting and lack of follow through on patient care issues persisted."  (Def.'s Mem. in Supp. of Mot. for Summ. J. at 19 (internal citations omitted).)  This explanation of Lundy's termination is sufficient to satisfy Park Nicollet's burden of proffering a legitimate, nonretaliatory reason for Lundy's termination.

## 3.  Pretext

In light of Park Nicollet's enunciation of a legitimate, nonretaliatory reason for Lundy's termination, the burden shifts back to Lundy to demonstrate that this reason was pretext for unlawful retaliation.  *Torgerson*, 643 F.3d at 1046.  "To prove pretext, the employee must do more than show that the employment action was ill-advised or unwise,

but rather must show that the employer has offered a phony excuse." *McNary v. Schreiber Foods, Inc.*, 535 F.3d 765, 769 (8th Cir. 2008) (internal quotation marks omitted). A plaintiff may demonstrate a material question of fact regarding pretext in at least two ways, either by showing "that the employer's explanation is unworthy of credence because it has no basis in fact" or "by persuading the court that a prohibited reason more likely motivated the employer." *Torgerson*, 643 F.3d at 1047 (alterations and internal quotation marks omitted); *see also Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 521 (8th Cir. 2010). A plaintiff may present evidence upon which a reasonable jury could conclude that an employer's explanation is unworthy of credence in a number of ways, including "by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Lake v. Yellow Transp. Inc.*, 596 F.3d 871, 874 (8th Cir. 2010). "Another common method of proving pretext is to show that it was not the employer's policy or practice to respond to such problems in the way it responded in the plaintiff's case." *Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 727 (8th Cir. 2001). In such circumstances, "even without pointing to other cases that were handled differently, a plaintiff can establish pretext by showing that it was unlikely an employer would have acted on the basis of the proffered reason." *Id.*

Here, the Court finds that Lundy has presented sufficient evidence of pretext to survive a motion to dismiss because a reasonable jury could conclude that the chain of events that precipitated her termination – which began with her request for FMLA leave and escalated when she took her final FMLA leave – demonstrate that Lundy's taking of

FMLA leave, rather than her performance, actually motivated Park Nicollet's decision. *See Ross v. Campbell Soup Co.*, 237 F.3d 701, 708 (6th Cir. 2001) (finding that chain of events leading to termination, including sudden drop in performance evaluation and dramatic increase in sales quotas, created inference of pretext).  As explained above in the context of the prima facie causation showing, a reasonable jury could determine from Wagle's comments expressing her displeasure with Lundy's taking of FMLA leave that her increased scrutiny of Lundy's attendance initially and later her performance was retaliatory in nature.  A jury could also reasonably conclude that other nurses who displayed similar attendance issues were not subjected to such increased scrutiny, and were not disciplined for arriving late or missing work.  A jury could also conclude that it was the combined effect of retaliatory increased scrutiny, disciplinary actions, and investigations that led to Lundy's termination.  *See Bader*, 2013 WL 6264660 at *14 ("A reasonable factfinder could determine from Sefcheck's sexual and gender-animus-evincing language that he had discriminatorily scrutinized Plaintiff's work so as to cause her termination. . . . And where a disciplinary decision is based on conduct that has been discovered as a result of scrutiny discriminatorily ordered by the decisionmaker, the discriminatory animus motivating the scrutiny may be imputed to the disciplinary decision itself.").

Here, in a meeting held the first day of Lundy's final FMLA leave – after Wagle had just told Lundy she could not believe that she was requesting more FMLA leave – Chilson noted that although it was "possible that [Lundy] could be terminated as a result of her performance" Wagle undertook an investigation to gather more information about

Lundy to support this result.  (Winter Aff., Ex. E at 24.)  A reasonable jury could conclude that Wagle's instigation of the investigation was retaliatory in nature, and therefore the termination decision itself – whether based on true information of Lundy's performance defects or not – was retaliatory.[10]  A reasonable jury could also conclude that other nurses who made errors in charting or received complaints from providers were not subjected to investigations for the purpose of compiling sufficient evidence to support their termination.  This evidence, combined with Lundy's strong prima facie case of causation, "suffice[s] to create a triable question of fact."  *Torgerson*, 643 F.3d at 1046.  For these reasons, the Court concludes that Lundy has presented sufficient evidence of pretext to survive a motion for summary judgment with respect to her discrimination claim under the FMLA, and will deny Park Nicollet's motion on that claim.

This case will be placed on the Court's next available trial calendar.

---

[10] Lundy has also presented evidence attacking the factual basis of the various alleged performance deficiencies identified in Wagle's October 4 memorandum and discussed at the termination meeting.  Although this evidence may well be probative of pretext at trial, the Court need not rely upon it here because the evidence of retaliatory scrutiny and investigation is sufficient to defeat summary judgment here.  Additionally, Park Nicollet presented evidence that other nurses who had taken FMLA were not disciplined or terminated.  This evidence may be persuasive to a jury, and a jury could believe that because of it, Lundy was not retaliated against.  But weighing this evidence against the evidence of pretext presented by Lundy is a job for the jury, not a task for the Court on summary judgment.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [Docket No. 19] is **GRANTED in part** and **DENIED in part** as follows:

1.      Defendant's motion is **GRANTED** with respect to Plaintiff's claims for interference/entitlement under the FMLA (Count I), disability discrimination under the MHRA (Count III), failure to accommodate under the MHRA (Count IV), and reprisal under the MHRA (Count V).  These claims are **DISMISSED with prejudice**.

2.      Defendant's motion is **DENIED** with respect to Plaintiff's claim for retaliation/discrimination under the FMLA (Count II).

DATED:  July 21, 2014                                   _____s/ John N. Tunheim_____
at Minneapolis, Minnesota.                                       JOHN R. TUNHEIM
                                                     United States District Judge